KEYSTONE COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64305.    Filed July 31, 1958.

*J. G. Holland, Esq.*, and *Donald W. Roe, Esq.*, for the petitioner.
*Thomas E. Fontecchio, Esq.*, for the respondent.

The Commissioner determined deficiencies of $4,205.74 and $5,459.07 in income tax of the petitioner for the years 1952 and 1953. The only

issue for decision is whether the Commissioner erred in denying the petitioner a deduction for depreciation on its depreciable property used by a lessee in mining coal under a lease from the petitioner.

### FINDINGS OF FACT.

The petitioner corporation filed its income tax returns for 1952 and 1953 with the director of internal revenue at Denver, Colorado.

The petitioner for many years prior to October 16, 1951, had operated the Keystone Mine in Colorado. It owned buildings, mine equipment, machinery, and other depreciable property which it used in the production of coal from that mine. Those same facilities were used by the lessees under leases hereinafter mentioned. The petitioner owned the fee title to some of the land and coal deposits and owned leases from the United States Government for the rest of the coal included in the Keystone Mine property.

The market for the petitioner's coal was rapidly declining in 1951 and was expected to continue to decline.

The petitioner entered into a "Lease and Agreement" on October 16, 1951, with Arrowhead Coal Company, whereby the latter became the lessee of the coal properties and depreciable property known as the Keystone Mine. The agreement required Arrowhead to pay to the petitioner "[a] royalty of 15¢ per ton for all coal mined and sold from the leased premises" and a "royalty or rental, as compensation for the use of the equipment and facilities * * * equal to 25¢ per ton on all coal mined and sold from the leased premises," but further provided:

that minimum royalties will be paid during every lease year as follows:
(1) A minimum royalty of $15,000 per lease year which shall be in full for the royalty on 100,000 tons of coal.
(2) a minimum royalty of $25,000 per lease year which shall be a minimum royalty or rental for the use of the facilities and equipment hereunder leased to Lessee by Lessor, and which shall apply upon the ultimate purchase price of said facilities and equipment as hereinafter set forth, and shall not be payable after purchase thereof shall have been consummated.

The petitioner expected to receive and actually received only the minimum payments of $15,000 and $25,000 under that lease during the first year. Arrowhead mined and sold only 89,081 tons of coal from the Keystone Mine during the first year of the lease. The petitioner and Arrowhead, at the request of the latter, entered into a supplemental agreement on March 16, 1953, reducing the annual minimum tonnage to 75,000 tons effective October 16, 1952, and reducing the plant rental to 15 cents per ton effective January 1, 1953, with a minimum payment for the coal of $11,250 and a minimum rental for the facilities of $11,250. Arrowhead mined and sold only 43,795 tons of coal from the Keystone Mine while the lease was in effect

during the second lease year. Arrowhead ceased production under the lease on August 31, 1953, and the parties made a final settlement. The amounts received by the petitioner for the second lease year as a result of this settlement were only a portion of the $11,250 minimum payments specified in the supplemental agreement.

The petitioner leased the same properties on August 31, 1953, to W. B. Dunn for the next 12-month period with privilege of renewal for another year if Dunn was not in default. The royalty and rental provisions of that lease were similar to those in the Arrowhead lease as amended except that the minimum tonnage was reduced to 50,000 tons with corresponding minimum payments for coal and the use of the equipment and facilities. Dunn produced only 44,583 tons during the first lease year and did not renew the lease.

The production of the Keystone Mine during the years 1937 through 1951 had exceeded 100,000 tons in the years 1941 through 1944 and 1947 through 1951. It ranged from a low of about 54,000 tons in 1938 to a high of about 95,000 tons in 1940, during the other years of that period. It steadily declined from 78,076 tons in 1952 to 32,062 in 1957. An adjoining somewhat larger mine was closed on March 1, 1951, because it could not operate profitably in the declining coal market. It was thereafter liquidated.

The petitioner on its returns for the taxable years claimed deductions for depreciation on all of its depreciable property in accordance with similar deductions claimed and allowed in prior years. $22,652.53 was claimed for 1952, and $21,603.70 was claimed for 1953. The petitioner, on its return for 1952, reported $26,562.96 as income from long-term capital gains, and on its return for 1953 it reported $20,601.16 as income from long-term capital gains, and in each return identified these amounts as "Coal Royalties under section 117j and 117k (2)." The petitioner reported on its returns income from rents of $22,287.49 for 1952 and $11,071.31 for 1953. The Commissioner, in determining the deficiencies, *inter alia*, disallowed the entire deductions claimed for depreciation and stated merely that they were "not an allowable deduction." He also made other adjustments not now in controversy.

All stipulated facts are incorporated herein by this reference.

#### OPINION.

MURDOCK, *Judge:* The petitioner had operated its coal properties and leases for a number of years prior to 1951 and had always claimed and been allowed a deduction for depreciation of the depreciable property owned by it and used in its mining operations. It had plenty of coal available for mining, but the market for its coal was diminishing critically and it accepted, in 1951, an offer to lease its

mineral properties and mining equipment. Each lease required a certain payment for the use of the mining equipment and another payment for the removal of the coal by the lessee. Both were based upon the amount of coal removed if more than a stated minimum number of tons of coal were mined, but each lease required a minimum annual payment for the use of the equipment and a separate amount for the removal of the coal if less than the minimum amount of coal was mined during the lease year. The rentals and the minimum were reduced as the business continued to decline. The minimum tonnage was never mined. There is no question of the bona fides of the leases, the terms of which were negotiated at arm's length.

The petitioner, following its prior custom, claimed deductions for depreciation of its mining equipment during the years 1952 and 1953, but the Commissioner, in determining the deficiencies, allowed no deduction for depreciation. The propriety of wholly disallowing depreciation is the only issue. The Commissioner made a number of other adjustments, but no issue is raised with respect to those adjustments. The Commissioner states his position as follows:

The Commissioner maintains that the lease agreements merged the petitioner's interest in the coal in place and its interest in the equipment and facilities into an economic interest in the coal and thereby converted its depreciable interest into a depletable interest. A so-called production-measured payment for the use of the facilities and equipment represents additional royalty from the coal property subject to depletion. In other words, payments received by the petitioner on the above-mentioned leases constitute gross income subject to depletion. The plant and equipment represent part of the petitioner's investment in minerals in place and his adjusted basis of the equipment and facilities becomes part of his depletable basis. Consequently, depreciation with respect to the equipment and facilities is not allowable to the petitioner during the lease term.

This theory was first proposed in Revenue Ruling 54–548 published in 1954–2 C. B. 91 (for the period July–December 1954). That ruling cites and relies without justification upon *Leechburg Mining Co.*, 15 T. C. 22, which did not involve any such question. The question there was the amount of the gross income from the property for the purpose of computing a lessee's percentage depletion deduction, and it was held that the amount paid by the lessee as rental for the depreciable equipment was to be subtracted from gross income in that computation. The Opinion included this sentence, favorable to the present petitioner, "We are not concerned here with a deduction in computing net income subject to tax, and the fact that the lessor of the property as owner of the facilities may recover from this 15 cent payment his investment therein by way of depreciation has no bearing."

The Commissioner, in an effort to support his ruling, refers in his brief to sections 23 (m) and 117 (k) (2) and Regulations 118, section 39.23 (m)–1, but those provisions do not support the ruling. The cited

portion of the regulations deals separately with depletion on coal and depreciation on improvements. Section 117 (k) (2) does not refer to depreciation but provides, in the case of the disposal of coal held for more than 6 months by the owner thereof who by contract retains an economic interest in the coal, that the difference between the amount received for the coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss upon the sale of the coal and the owner shall not be entitled to the allowance for percentage depletion provided in section 114 (b) (4). Section 23 (l) authorizes the deduction of a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business, or (2) of property held for the production of income. Section 23 (m) is entitled "Depletion" and provides a reasonable allowance in the case of mines for depletion and for depreciation of improvements, according to the peculiar conditions in each case, to be made under rules and regulations to be prescribed by the Commissioner. It also provides that in the case of leases the deductions shall be equitably apportioned between the lessor and lessee. However, no question of equitable apportionment between the lessor and lessee is raised or discussed by the parties in this case.

The petitioner was entitled to a deduction for depreciation of its depreciable property during the taxable years under section 23 (l) and (m) as well as Regulations 118, section 39.23 (m)–1, and that right was not affected by section 117 (k) (2) which does not relate in any way to depreciation. The Commissioner's Revenue Ruling 54–548, which he would apply retroactively in this case, attempts to tie in the depreciable property with the property subject to depletion and in that way eliminate the deduction for depreciation. Such a method of disallowing depreciation is not authorized by any provision of the 1939 Code, but, in fact, is contrary to the provisions of that Code as enacted by Congress. The provision in section 23 (m) that the reasonable allowances therein are to be made under rules and regulations to be prescribed by the Commissioner does not delegate to him the legislative function which rests in Congress, and his Revenue Ruling 54–548 is an unwarranted attempt to legislate in regard to a matter which would require an Act of Congress.

The petitioner is entitled to a deduction for depreciation under section 23 (l) and (m) with respect to the entire basis for its depreciable property. The parties are in agreement as to figures under the conclusions of the Court as expressed herein.

*Decision will be entered under Rule 50.*